Good morning, Your Honors. My name is Mark Nerheim, and I'm an attorney from the Law Offices of Bart Klein, representing Mr. Daniel Washington. I'd like to reserve three minutes for rebuttal for the balance of my time, if I can. In this case, I'm just going to touch briefly on the facts. Our position is that the facts and the law in this case are straightforward, and the government's determinations in this case are based upon errors of law, and therefore are reviewable under Cardoza-Ponseca, Meltonian v. Ashcroft, Kovac v. Ines, and Tarvan v. Ines. Our position is that the relevant facts are not really in dispute. Mr. Washington is a native and citizen of Romania, and entered the U.S. on a B-2 visitor's visa. He was originally granted time to remain in the U.S. until July 6th, 1992. He married a U.S. citizen who filed a petition on his behalf, a 9-1-30 visa petition, which was approved by the Immigration and Naturalization Service. He also then applied for adjustment of status. He had eventually an interview on the adjustment of status application, and at that time, the INS placed a stamp inside his passport known as an I-551 stamp, indicating that he had been granted on a temporary basis lawful permanent residence. The temporary nature of this basis is in part because he was granted conditional permanent residence, which required that within a, at the conclusion of a two-year period, that he file a petition to remove the conditions on his residence status. That form would have been known as an I-751. After, on September 1st, 1992, after the INS had stamped his passport indicating that he had status in the U.S., he wrote a letter to the INS to acquire about a claim that he had previously filed for asylum. He wrote that he wanted to continue to pursue his asylum claim because he was a refugee and that his life was in danger in Romania, and that's the letter itself is at the administrative record at page 110. He did not ask to withdraw his adjustment of status or cancel his LPR status. Now, he said if it's necessary for the lawful permanent resident status to be withdrawn, that's okay, something like that. He said if it was necessary. That they could do that, if that's how he could preserve his asylum claim. But he never asked that it be dismissed or withdrawn. Not at that time. What would happen, so if we said that the government had improperly withdrawn it, had taken action that, you know, equitably stops them from moving forward, what would happen now that he's been divorced? What would be the status of this conditional residence permit? Well, actually, the immigration judge, I guess I'm going to answer this with two elements. First of all, the immigration judge at the hearing said he was treating this essentially as a legal issue. And that's throughout the transcript at AR 45 through 55. And then at the administrative record at page 61, lines 20 through 25, the immigration judge answers that question virtually directly himself. He says, quote, I have no legal authority to review the district director's decision and if you go to the next page, it's parenthetically, on the withdrawal, but you could get review of a denial of adjustment of status and removal of proceedings if they had denied him adjustment of status officially. He also says that he would have to go back on that. I'm just trying to understand as a practical matter. You want us to grant his petition, obviously. Correct. So if we granted his petition, he would go back and, in effect, he would get a ruling and they would either grant or deny and then he'd go from there? That's correct. In fact, at AR 34, the judge also said, well, if you have conditional residence, which is what we're saying he's maintained all the way through, I'll agree to let you file an I-751, that's the petition to remove conditions, even knowing that they had been divorced or separated, and the petition to remove conditions on residence and that's at AR 34 and that's at lines 5 through 6. So this does make a significant difference in the legal posture of the case, the avenues of relief that Mr. Washington would have had. Before we get to that point, however, let me flag for you the difficulty I have with your client's position. His letter to the IRS or his communication is, I'd say, not an express statement that he wants to terminate that adjustment procedure. So they may have misread it. But if they misread it, they sent him an absolutely unequivocal notice saying that we've terminated your adjustment status, you know, indicating how that they had read his letter that way, and he didn't object to that. So it seems to me that maybe they were negligent, but there's clear law that says there can't be an estoppel against the government and particularly against the agency here for negligence. Like if they give an immigrant negligent legal advice about what to do. So what is the evidence of affirmative misconduct? It might be negligence. It might be gross negligence. But how do you get affirmative misconduct, which, as I understand it, is sufficient to, is necessary to get an estoppel? Well, Your Honor, the estoppel issue is, you know, like, as we're aware, is a hard burden to meet against the government. But in this case, if you apply the analysis that's laid out in Saldado, the four-point analysis in there, our position is that he meets that requirement. Because the letter from Immigration Service doesn't exactly say that they've necessarily done this. It says you request this office to withdraw your opinion, and then they just conclude, this completes all service, all action by the service in this matter. And I think that their response is a little bit misleading. Doesn't it, doesn't the response say that it's terminated or denied? I'd have to go back to the record. I can come back and reply. I thought it was absolutely unequivocal. But maybe I'm mistaken. I don't have that record right in front of me. I believe that's on page AR109, and I'll take a look at it, Your Honor, during my rebuttal. I think the notice said, this completes all action by this service in this matter. Right. And I guess my position is I think that's still somewhat unequivocal about what they finally did on it. But we believe that the elements of misconduct and affirmative misconduct, the elements of estoppel versus the party to be estoppel, is the facts. Well, in this case, the INS agents knew that what they, that they had already issued to him an I-551 stamp, they knew that a withdrawal would have, in effect, have blocked his status severely or affected it severely. And that they also knew or should have known that someone who was an asylum applicant and also the beneficiary of an adjustment of status did not automatically have to revoke or withdraw his asylum application. And knowing that … But why is it more than negligence? Because I think that they knew that they were putting him in this jeopardized position. Secondly, the INS agents intended, we believe, that this was going to be the outcome. Not that they were necessarily trying to deport him per se, but it appears that way. They know that the immigration judge would likely have relied upon their decision if he was eventually placed in proceedings, which he was. And I think that they knew that element. And the claimant himself was ignorant of the true facts in this case about what his legal duties were and obligations were. And I think that's, and he was from Romania, and, you know, when you look at the applications, he's just scribbled things, and it's, you know, I'm not, you're asking me to speculate about why he didn't directly respond and whether this meets that, but it seems to me that this is very cynical. Well, more importantly, I can understand he might not respond, but still, I'm having difficulty seeing the government's conduct as more than negligence. But, well, but the impact of it, though, was very severe in this case. I thought affirmative misconduct was like somebody's intention, you know, intentionally trying to hurt somebody. Well, there is that letter in the file there where they described him earlier in the proceeding as being like a dead skunk in the road or something like that, or he was roadkill. But we referenced that, and it shows some perhaps general bias, but we had referenced it that despite that warning or note that was in the file, they still had adjudicated his application and had granted him his status. But it does show a pretty, I think that language shows sort of a mindset when they describe him as roadkill. It shows the person who wrote it was biased, perhaps, and didn't think he had a very good claim, but it doesn't really show affirmative misconduct by the, in my, you know, in my reading of it, it wouldn't prove affirmative misconduct of the people who made the read of his letter and misread it later. Well, Your Honor, I think that I understand what you're saying, but I think that in this case, the experience was so severe and the consequences were so drastic, and the Immigration Service should have known that, and they already have that statement. I think we have your point, and we'll see what the government has to say on that. I hear from the government. Thank you, Mr. Ehrheim. Good morning. May it please the Court. James Grimes for the Attorney General. Your Honors, I think the question for the Court ultimately comes down to whether or not Mr. Washington had conditional lawful permanent residence status, and if I may, I can explain why that is and address the Court's inquiry about affirmative misconduct. But I believe that's essentially the question that's before the Court, and for our purposes, whether or not the decision, the determination that he withdrew his application is correct or not really doesn't matter. What really matters is that the decision was made and what were his options. And the reason I frame the question as I have is really comes down to a matter of jurisdiction, because as the immigration judge said, if Mr. Washington had that status, then the immigration judge would have held the proceedings while the to allow the INS to adjudicate the waiver application. And, of course, the immigration judge would have jurisdiction explicitly to review any resulting denial. But if instead Washington never had the status, there was nothing to adjudicate, because the immigration judge didn't have jurisdiction to review determination that it was withdrawn. But, I mean, don't you have to deal with the estoppel issue? Because it appears that the letter he wrote does not say terminate my request or application for adjustment. It says if it has to be done to keep my asylum claim terminated, but it doesn't really request them to terminate it, yet they did. I think that's a, I can't argue with that. It appears to be a misreading of what his intention was. Did this case ever go to mediation? Did this case? Yes. Before this Court, Your Honor? Yes. No, not that I'm aware of. Okay. You know, let me just tell you, you know, most of the cases we see, and you know this, you know, we're wrangling over past and former persecution and substantial evidence and those kind of things. It seems to me here you have kind of a technicality and a procedural morass. And I guess I'm just wondering, you know, you have a guy who is here with a 551 stamp, which may or may not be prima facie evidence, a rebuttable presumption, but it just seems that this is a different kind of case than the large bulk of the other 3,999 cases that we see before this Court. I agree with you, Your Honor. I'm just wondering why it can't be resolved. Well, maybe I can explain that. I mean, first off, the immigration judge doesn't have jurisdiction to review the determination that was withdrawn. He simply didn't have jurisdiction to address that, so it's not really before the Court. That's why I say the question isn't whether or not that decision was correct. It's that it was made and what could he do about it. And so the question really comes down to whether or not he had the status. But if we concluded that the elements to create an estoppel against the government were present, then wouldn't we have to treat it as if he had that status? Well, let's say a case we don't quite have here, that there was evidence of something in the file of some bureaucrat saying, you know, he's not really asking us to terminate this status, but I don't like this guy, and I think his claim is bogus, and let's just terminate it and see if maybe he won't speak up, you know. Your Honor, I – Well, let's assume we have that case. Okay, Your Honor – Wouldn't there be an estoppel? No, and let me see if I can explain. He had three options at that point. He could have – And just to refresh us, you mean at the point of denial? In November of 1992, he could have sought reconsideration or reopening before the district director. He could have alerted the INS to its error, which is what the Petitioner in the Ewe case, which the Court cited in its order, did. He could have done that. He could have refiled the application. The application was based on the I-130 visa. That was still valid. It wasn't withdrawn, so he could have simply just refiled the application. That's all he had to do. In fact, if you look at the regulations, 8 CFR 102.3B15 says that a withdrawal does not preclude an alien from refiling the application. That's all he had to do. Or he relies on an unpublished case from the Southern District of New York. He could have done what that enemy did, going into district court. He could have done a lot – there are obviously things he could have done that he didn't do. But in the case – in the extreme hypothetical case I'm giving you, could there be an estoppel against the government to stop it from denying that he had that status? I think that he may have had an estoppel claim from the time that the stamp was put into his passport until November when he was told, you don't have this status. So he may have it during that time. But he then had – I think it was 18 months before he was divorced. He had 18 months that he could have refiled a petition. He could have said, look, you made a mistake. And he waited until 1995 to file the I-751 application, and that doesn't address the issue of the withdrawal. So even then he didn't – he didn't actually do anything. If it were remanded, just hypothetically, what would he do? Would he refile his I-751 or what would be the procedural posture? To remand the court, I think, would first have to determine that he had the status in the first place. Because if he didn't have the status, then there's nothing – there's nothing to do. Well, if the equitable estoppel doctrine were to be applied by us, the result would be that he did have that status. I agree with Your Honor. That would be until he was told – until he was affirmatively told in November of 1992, you don't have this status. So there is that two or three month window that he would have – he could have relied on the stamp. Well, it's his obligation to show the affirmative misconduct. And as Judge Gould says, it's a very difficult standard. We do have the 551 stamp, however, in some courts saying that that creates kind of a rebuttable presumption. Well, I agree, Your Honor. That is some evidence. And if you look to HCFR 103.2B17, that lists the things you can look to. And a stamp, that is one thing that he could rely on. But that provision also says absent countervailing evidence. And there are five pieces of evidence that the INS submitted to show that he actually didn't have the stamp. There's the face of the petition itself at page 206. There's the INS's letter, which is at 202. There's the search of the database, which is at page 207, which is in the record at 68 to 81. There's the I-181, which is the memorandum of creation of the status. That's not complete. And there's the I-468 worksheet that shows that the application was denied. But your point, as I understood it, just to be clear, is that even if you didn't have all those other documents, his 551 status was only good up to the point where the service told him directly that his situation was denied, correct? And at that point, he should have taken action because he knew one way or the other that you did not agree with his view of the facts. A person who wants to seek equity has to act with diligence to protect his rights. He didn't do that. And my point is that he could rely on that stamp. And here's what I think happened. If you look at the record at page 204, which is the I-181, you can see that it's the district director who has the ultimate authority to confer that status. Obviously, he doesn't interview all of the applicants. And you can see, if you look to the left of where the district director signs off, it says recommended by. So the immigration officer conducts the interview, makes the recommendation, and then the district director signs off on the status. So what appears to have happened here is the immigration officer made the interview, decided to recommend, put the stamp in the passport before it was actually effective. And but before the district director could make his decision, the INS received the letter, which it appears that it misread. But that's why I believe that that stamp is in there because, as you can see, the I-181 was never completed. So then we get to what could he do. And I think I've addressed there are three things that he could have done. Now, as I said, there is the problem that the immigration judge wouldn't have jurisdiction to review the determination that it was withdrawn, that the application was withdrawn. And I don't think that Mr. Washington has actually preserved that issue. If you look at his notice of appeal to the board and his brief to the board, he doesn't argue that the immigration judge had authority to do that. He hasn't exhausted that issue. And I invite you to look at that at pages 9 and 16 of the record. So I don't think he's addressed that. But in any event, I don't believe there was misconduct. The worst we have here is a misreading of the letter. And it's something that he easily could have corrected. He could have informed the INS, listen, you've made a mistake. He could have refiled his petition easily within the 18 months before he was divorced. And there's no estoppel, because he was not ignorant of the true facts. The INS told him, we're denying this application. We don't have a Salgado-Diaz situation here. He's not in a catch-22 because he had options. He could have simply refiled the petition. And in fact, if you look at the letters that his wife sent in 1993 to the INS at pages 125 to 127, you can see that he really wasn't interested in trying to pursue this status. He was much more interested in this asylum application. I invite your attention to those pages. In any event, because the record supports the immigration judge's determination that he didn't, he was never conferred this status, because the immigration judge had no authority to review the withdrawal, and because Washington has not preserved the issue, we believe this petition should be denied. Thank you. Thank you. You've spent all your time. You can have one minute if you need for rebuttal. Thank you very much, Your Honor. First thing I want to point out is that letter that he referred to, the denial notice on page 109, it doesn't advise him of any particular right that he has to renew anything except for the very last sentence where it says, if you fail to depart from the United States by the date specified, proceedings will be instituted to enforce your departure. You may renew your application for status as a permanent resident during such proceedings. When you look at that, it indicates that he was never given any notice, anything that told him about going back to refile in the immigration judge calling it too big. No, but it told him that he was going to be put on the airplane and sent back, didn't it? Right. But it said that if he didn't depart. And then it says you can renew it in those immigration judge proceedings. And so far as this issue, whether he preserved this issue on the I-551, our position is that he did. I mean, it was raised throughout the litigation before the immigration judge. And the immigration judge said as a matter of law, I don't, this I-551 has no, the stamp has no meaning. Thank you. We have your argument in mind. We will go back ourselves now that you've both raised the exhaustion issue. The case of Washington v. Gonzales is submitted.
judges: Thompson, McKeown, Gould